IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MICHAEL S. MCCLAIN, and ROSALEE
JANETTE MCCLAIN,

          Plaintiffs,

v.                                  Case No.  25-4036-JWB

BOARD OF COUNTY COMMISSIONERS
OF SEDGWICK COUNTY, KANSAS, et al.,

          Defendants.

**MEMORANDUM AND ORDER**

This matter is before the court on Defendants SG Communities' and Megan Baugh's motion to dismiss.  (Doc. 116.)  The motion is fully briefed and ripe for decision.[1]  (Docs. 117, 118, 120, 125.)  Defendants' motion is GRANTED for the reasons stated herein.  (Doc. 116.)

**I.    Facts**

The following facts are taken from Plaintiffs' fourth amended complaint.  (Doc. 111.)  The court assumes their truth for the purposes of this order *but is not required* to accept legal conclusions—or legal conclusions couched as factual contentions—as true.  *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 877–78 (10th Cir. 2017).  Plaintiff Michael McClain is a disabled military and law enforcement veteran.  (Doc. 111 at 2.)  Plaintiff Rosalee Janette McClain is also a disabled combat veteran.  (*Id.* at 2–3.)  Both Plaintiffs suffer from post-traumatic stress disorder

---

[1] Defendants bring to the court's attention that many of the case citations employed by Plaintiffs in their response to the motion to dismiss are faulty and do not stand for the propositions of law for which they are cited.  (Doc. 125 at 1–7.)  Defendants go on to invoke this court's standing order on the use of artificial intelligence in documents filed with the court.  D. Kan. Standing Order 26-01.  This court has previously warned Plaintiffs about their use of artificial intelligence.  *See McClain v. Board of County Commissioners of Sedgwick Cty.*, No. 25-4036-JWB, 2025 WL 3550614, at *7, n. 1 (D. Kan. Dec. 11, 2025).  While the court has confirmed that many of Plaintiffs' citations are inaccurate or lack important context, the court declines to enter a show cause order at this time as it perceives Plaintiffs' errors as less egregious than those addressed in the court's previous order.

("PTSD"). (*Id.*) Plaintiff Rosalee McClain is a sexual assault survivor. (*Id.*) Defendant Board of County Commissioners of Sedgwick County, Kansas, is a county government. (*Id.* at 3.) Defendant Jeffrey Easter is the Sedgwick County Sheriff. (*Id.*) Defendants Samuel Humig and Cody Nail are deputy sheriffs in Sedgwick County. (*Id.* at 3–4.) Defendants Jeremy Langley and Tyra Olson are intensive supervision officers employed by the Sedgwick County Board of Corrections. (*Id.* at 4–5.) Defendant Nicholas Sholander is a "corporal" at the Sedgwick County Adult Detention Facility ("Sedgwick County Jail"). (*Id.* at 5.) Defendant Jared Schecter is a "colonel" and administrator of the Sedgwick County Jail. (*Id.*) Defendant SG Communities is Plaintiffs' former landlord and the property management company in charge of the Maple Village Mobile Home Community in Goddard, Kansas. (*Id.* at 6.) Defendant Megan Baugh is employed by SG Communities and serves as the "property manager" of Maple Village. (*Id.*)

In July 2022, Plaintiffs entered a lease[2] with SG Communities for a "manufactured home" in Maple Village. (*Id.* at 6–7.) The payment due to SG Communities was $655 per month. (*Id.* at 7.) Apparently, SG Communities overcharged Plaintiffs $10 per month, as they paid $665 for the first nine months of their residency at Maple Village. (*Id.*) This amount ($90) was refunded to Plaintiffs in April 2025. (*Id.*) Plaintiffs made 34 consecutive on-time payments to SG Communities without incident. (*Id.*)

A provision of the lease agreement, and apparently all lease agreements at Maple Village, prohibited registered sex offenders from becoming residents or visiting the complex. (*Id.* at 8.)

---

[2] Plaintiffs describe the "transaction documents" as including a "Promissory Note, a Federal Consumer Leasing Act disclosure, and an Addendum A (Option to Purchase)." (Doc. 111 at 6.) The promissory note apparently reads: "This Promissory Note represents an unsecured obligation due and owing from Promisor to Payee, as partial payment for Payee's transfer of Certificate of Title to the manufactured home to Promisor upon execution of this Promissory Note." (*Id.* at 6–7.) Plaintiffs appear to believe that this forecloses any use of "landlord-tenant eviction procedures" and requires "UCC Article 9 foreclosure or replevin to seize the personal property." (*Id.* at 7.) In any event, the court does not believe this is material to Plaintiffs' claims; the complaint goes on to describe the rental agreement and refers to it as a "lease agreement" throughout. (*Id.*)

Plaintiffs relied upon this provision when selecting where to live.  (*Id.*)  Plaintiffs allege that "[p]rior to April 2, 2025, SG Communities, acting through Megan Baugh and with the authorization of [Defendant] Jeremy Langley, allowed Damon Sampson—a known registered sex offender—to reside at lot C4" at Maple Village. (*Id.*)  Sampson's residence was not disclosed to Plaintiffs.   (*Id.*)   Plaintiffs claim that Defendants Langley and Olson "used their official government authority as community corrections officers to sanction and facilitate an occupancy without legal authorization under the lease . . . ." (*Id.* at 9.)  Plaintiffs claim that Defendant Langley admitted on "body camera" that he authorized the placement, and Defendant Baugh likewise admitted that she "was making an exception to the sex offender rule." (*Id.*) (internal quotation marks omitted).

On April 2, 2025, Plaintiff Michael McClain "confronted the situation" regarding Damon Sampson's residency at Maple Village. (*Id.* at 10.)  The situation had apparently "de-escalated" before law enforcement arrived. (*Id.*)  Defendants Langley and Olson were "already on scene." (*Id.*)  Plaintiffs claim that Defendant Olson "counseled" Sampson on "security measures" but did not address Plaintiffs' alleged lease violation or "disability concerns."  (*Id.*)  At one point with only Defendant Olson present, Defendant Langley "made an aggressive pointing gesture directed toward Plaintiff—constituting an aggressive command posture that triggered Plaintiff's PTSD symptoms . . . ." (*Id.*)  Defendant Olson "took no action to intervene or de-escalate."  (*Id.*) Defendants Humig and Nail arrived after this occurrence. (*Id.*)  According to Plaintiffs, they were both aware of the situation with Sampson but took no action "to address Sampson's unauthorized presence, remove him, or enforce the lease covenant."  (*Id.*)  Plaintiffs assert that Defendants Humig and Nail also heard Defendant Baugh's admission "that she was making an exception to the sex offender rule . . . ." (*Id.*)  According to Plaintiffs, "both deputies accepted the word of a

felon under active supervision whose presence lacked legal authorization under the lease as the sole basis for arresting Plaintiff Michael McClain—a 100% disabled combat veteran and retired law enforcement officer with 24 years of service—who had done nothing more than object to an unauthorized sex offender living in his community in violation of his written lease." (*Id.*) Plaintiffs claim this arrest violated several of Mr. McClain's rights. (*Id.* at 11.) Additionally, Defendant Cody Nail allegedly lives in a community where SG Communities is also his landlord. (*Id.*) This "undisclosed financial relationship", Plaintiffs argue, "taints his participation" and makes clear that "he was acting in the financial interests of his landlord rather than enforcing the law neutrally." (*Id.*)

Mr. McClain was arrested on one charge of battery. (*Id.*) He was released on his own recognizance the same day. (*Id.*) He was required to return to court on April 16, 2025. (*Id.*) He did so and was required to provide his address. (*Id.*) No charges had formally been filed as of this appearance. (*Id.*) On May 27, 2025, Mr. McClain was arrested again. (*Id.*) That same day, Plaintiffs were evicted, the landlord changed the locks on their home, and Mr. McClain was removed from the property. (*Id.*) This arrest was supported by multiple charges, including battery of a law enforcement officer, aggravated criminal threat, interference with judicial process, and simple battery. (*Id.*) Mr. McClain was kept under court-supervised bond conditions from the time of his arrest to January 27, 2026. (*Id.* at 12.) This date is one day after the discovery deadline in this case. (*Id.*) Plaintiffs contend this "raises a reasonable inference of coordination between the state criminal case and the federal litigation." (*Id.*)

Mr. McClain reached a plea agreement related to his charges on October 1, 2025. (*Id.*) He pled guilty to three counts of assault and paid a financial assessment of $410. (*Id.*) But on December 1, 2025, a new amended information was filed against him. (*Id.*) This information

4

named Kayla Shelton, Damon Sampson's girlfriend, as a victim of the April 2, 2025, incident for the first time. (*Id.* at 12–13.) Plaintiffs claim that this late inclusion, plus the prosecution's insistence on pleading guilty to three charges of assault stemming from one incident, "raises serious questions about the integrity of official records . . . ." (*Id.* at 13.)

After his May 27, 2025, arrest, Mr. McClain was taken to the Sedgwick County Jail. (*Id.* at 13.) During his intake processing, he suffered a seizure. (*Id.*) Mr. McClain was denied all medications while in custody, including medications required to treat his PTSD. (*Id.*) He was later released by Defendant Sholander "without resources, transportation assistance, or any accommodation for his known medical conditions, effectively abandoning a 100% disabled combat veteran in Wichita." (*Id.* at 14.) When Mr. McClain asked to make a telephone call, Defendant Sholander allegedly rebuffed the request by saying Plaintiff could but would be in jail longer. (*Id.*)

Plaintiffs' complaint then moves to cover allegedly retaliatory actions taken by Defendants after Mr. McClain's arrest. (*Id.*) "[B]efore, during, and after the April 2, 2025, incident," Mr. McClain claims he engaged in numerous protected activities to include "reporting the sex offender and lease violation to SG Communities; contacting the Kansas Bureau of Investigation; filing ADA accommodation requests; submitting KORA requests; filing complaints with the Sedgwick County Undersheriff; filing complaints with the Department of Justice; filing a housing discrimination complaint with HUD; and filing this federal civil rights action." (*Id.*)

Two days after the April 2, 2025, incident, Plaintiffs were served a "30-Day Notice to Quit/Vacate" that was signed by Defendant Baugh. (*Id.*) The notice cited community rules that prohibited threatening or intimidating and assault. (*Id.*) The eviction was executed on May 27, 2025. (*Id.* at 15.)

5

For these events, Plaintiffs raise several claims for relief.  First, they claim violations of 42 U.S.C. § 1983 with respect to the First, Fourth, and Fourteenth Amendments, and a failure to intervene claim.  (*Id.* at 16–24.)  Second, they allege a violation of the Americans with Disabilities Act ("ADA").  (*Id.* at 19–21.)  Third, Plaintiffs assert a violation of the Fair Housing Act ("FHA").  (*Id.* at 21–22.)  Finally, Plaintiffs bring a claim under the civil Racketeer Influenced and Corrupt Organizations ("RICO") Act.  (*Id.* at 22–23.)

Only two of these counts are alleged against Defendants SG Communities and Defendant Baugh: the FHA claim and the RICO claim.  Therefore, the court only addresses those two claims below.  (*Id.* at 21–23.)

## II.    Standard

To withstand a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must contain enough allegations of fact to state a claim to relief that is plausible on its face.  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  All well-pleaded facts and the reasonable inferences derived from those facts are viewed in the light most favorable to Plaintiffs.  *Archuleta v. Wagner*, 523 F.3d 1278, 1283 (10th Cir. 2008).  Conclusory allegations, however, have no bearing upon the court's consideration.  *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007).  Given Plaintiffs' pro se status, the court construes the pleadings liberally, but it cannot act as their advocates or construct arguments on their behalf.  *Garrett v. Selby Connor Maddux & Janer,* 425 F.3d 836, 840 (10th Cir. 2005) (citation omitted).

## III.    Analysis

### A.    Fair Housing Act

Plaintiffs plead that they are handicapped within the meaning of the FHA. (Doc. 111 at 21.) They also plead that SG Communities is a "covered entity" within the meaning of the Act. (*Id.*) The gravamen of Plaintiffs' FHA claim is that Defendants violated 42 U.S.C. § 3604(f)(2) by "failing to provide reasonable accommodations in the terms, conditions, and privileges of the rental when Plaintiffs required enforcement of the no-sex-offenders covenant as an accommodation for their documented disabilities." (*Id.*) They claim SG Communities and Megan Baugh had no authority to "unilaterally waive" the "covenant" without Plaintiffs' consent. (*Id.*) They also claim that SG Communities violated § 3617 by evicting Plaintiffs in retaliation for raising concerns about the placement of a sex offender in the Maple Village community. (*Id.* at 22.) These allegations present two distinct claims, and the court analyzes them separately.

*1. Failure to Accommodate*

The FHA prohibits discrimination against "any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of--

(A) that person; or

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

(C) any person associated with that person."

42 U.S.C. § 3604 (f)(2)(A)–(C). For purposes of this statute, discrimination includes refusal to make reasonable modifications to a property that would afford a disabled person full enjoyment of the property, "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling", and failure to design and construct dwellings with certain accessible features. *Id.* at § 3604 (f)(3)(A)–(C). Plaintiffs' allegations concern a provision of the lease agreement (the

7

no sex offender clause) and therefore fall under 42 U.S.C. § 3604 (f)(3)(B) which concerns failures to accommodate with respect to "rules, policies, practices, or services." (*See generally* Doc. 111.)

To properly plead a claim under these provisions, Plaintiffs "must show: (1) that [they are] handicapped as defined by the FHA; (2) that Defendants knew or reasonably should have known of the claimed handicap; (3) that accommodation of the handicap may be necessary to afford Plaintiff[s] an equal opportunity to use and enjoy the dwelling; (4) that the accommodation is reasonable; and (5) that Defendants refused to make such accommodation." *Wren v. City of Cherryvale, Kansas*, No. 22-CV-1180-JWB, 2022 WL 3682001, at *3 (D. Kan. Aug. 25, 2022) (citing *Arnal v. Aspen View Condo Ass'n, Inc.*, 226 F. Supp. 3d 1177, 1183 (D. Colo. 2016)). Defendants argue that Plaintiffs have failed to properly plead the last three elements of the test. (Doc. 117 at 9.)

In support, they argue that "[t]he FHA does not require a landlord to enforce lease covenants against third parties as a disability accommodation." (*Id.*) (emphasis removed). Defendants cite cases that explain that the FHA only requires modifications of the landlord's own "generally applicable" rule but does not require "[c]ompelling a landlord to initiate eviction proceedings against a neighbor . . . ." (Doc. 117 at 10) (citing *Keys Youth Servs., Inc. v. City of Olathe*, 75 F. Supp. 2d 1235, 1250 (D. Kan. 1999)). Second, they argue that Plaintiffs have not pled that they ever made a formal request for accommodation. (*Id.* at 10–11.) Third, they argue that Plaintiffs' "proposed accommodation" does not have a "nexus" to Plaintiffs' disabilities. (*Id.* at 11.) Plaintiffs largely do not respond to these arguments. (*See* Doc. 118 at 9–11.) Additionally, they do not cite a single case in support of the arguments they do make. (*Id.*) Plaintiffs do attempt to distinguish their claim from Defendants' argument by casting it as a "discriminatory terms-and-

8

conditions claim" and "not a standalone failure to accommodate claim." (*Id.* at 10.) After review, the court agrees with Defendants.

As Defendants persuasively argue, attempting "to recharacterize the FHA theory as a pure 'terms and conditions' claim under § 3604(f)(2), untethered from any failure-to-accommodate analysis, fails" for multiple reasons. (Doc. 125 at 9.) First, whatever sort of discrimination is alleged, it must be "because of" Plaintiffs' handicap(s). 42 U.S.C. § 3604(f)(2); *see also Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 920 (10th Cir. 2012). The court agrees with Defendants that Plaintiffs have not alleged any facts that tend to show that Defendants situated Damon Sampson at Maple Village "because of" Plaintiffs' disabilities. (Doc. 125 at 9.) Moreover, Plaintiffs' attempts to distinguish between a "terms-and-conditions" and "failure-to-accommodate" claim is nonsensical when examining the statute under which they sue. Section 3604(f)(2) prohibits discrimination "because of" a person's disability. The FHA then goes on to specify *kinds of discrimination* that are cognizable under the statute. 42 U.S.C. § 3604(f)(3). One such form of discrimination is refusal to make reasonable accommodations concerning the landlord's "rules, policies, practices, or services." *Id.* Therefore, it is impossible to separate out "terms-and-conditions" from "failure-to-accommodate", they are interrelated elements of the FHA.

Additionally, Defendants are correct that Plaintiffs have failed to plead a reasonable accommodation because "the thrust of a reasonable accommodation claim is that a defendant must make an affirmative change in an otherwise valid law or policy." *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501–02 (10th Cir. 1996). Plaintiffs have not alleged this kind of accommodation. Instead, Plaintiffs attempt to use the FHA to enforce a provision of their lease. (Doc. 111 at 7–8.)

9

This is categorically different than a claim under the FHA and sounds in common law breach of contract rather than federal housing law.

Finally, Defendants are also correct that Plaintiffs have not pled that they made a formal request for accommodations which is required in order to show Defendants "refused to make the accommodation." *Summers v. City of Fitchburg*, 325 F. Supp. 3d 203, 210 (D. Mass. 2018) ("The reasonable accommodation requirement applies when triggered by a request, and when the request is voluntarily withdrawn, it cannot be relied upon to prove that the defendant refused to make the accommodation.") (citing *Aldini v. Kroger Co. of Michigan*, 628 F. App'x. 347, 351–52 (6th Cir. 2015) (internal quotation marks and citation omitted)). Accordingly, because of the above defects in Plaintiffs' complaint, Defendants' motion to dismiss count IV as to the failure to accommodate claim is granted.

2. *Retaliation*

Retaliation under the FHA is a distinct claim, and is prohibited by 42 U.S.C. § 3617, which reads: "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." To properly allege a retaliation claim Plaintiffs "must show that '(1) [they are] protected individual[s] under the FHA, (2) [they were] engaged in the exercise or enjoyment of [their] fair housing rights, (3) the defendants coerced, threatened, intimidated, or interfered with [Plaintiffs] on account of [their] protected activity under

10

the FHA, and (4) the defendants were motivated by an intent to discriminate.'"[3]   *Hatfield v. Cottages on 78th Cmty. Ass'n*, Nos. 21-4035, 21-4042, 21-4045, 2022 WL 2452379, at \*8 (10th Cir. Jul. 6, 2022) (quoting *Bloch v. Frischholz*, 587 F.3d 771, 783 (7th Cir. 2009)).

Defendants argue that Plaintiff has failed to plead that the eviction was because of protected activity under the FHA.[4]   (Doc. 117 at 12.)   Instead, they posit, the eviction was due to a "documented criminal incident" and "[n]onpayment of rent" that the complaint itself notes.  (*Id.* at 12–14.)  Plaintiffs largely do not respond to this argument and instead point to factual allegations outside the complaint.  (Doc. 118 at 11–13.)  The court agrees with Defendants.

"[A]t the motion to dismiss stage, the plaintiff need only state a *plausible* claim." *O'Connor v. Collett's Mountain Resorts, Inc.*, No. 25-CV-487-DBB, 2026 WL 91584, at \*3 (D. Utah Jan. 13, 2026) (holding in the context of ADA and FHA claims that at the motion to dismiss stage, a Plaintiff need only state a plausible claim (in lieu of a prima facie one) and "need not rebut a defendant's proffered rationale for termination.").  Plaintiffs' complaint lists several "protected activit[ies]" to include: "reporting the sex offender and lease violation to SG Communities; contacting the Kansas Bureau of Investigation; filing ADA accommodation requests; submitting KORA requests; filing complaints with the Sedgwick County Undersheriff; filing complaints with the Department of Justice; filing a housing discrimination complaint with HUD; and filing this federal civil rights action."  (Doc. 111 at 22.)  Plaintiffs plead that Defendants retaliated against

---

[3] The Tenth Circuit has not formally adopted this standard in a published opinion, however in the unpublished opinion cited here, the circuit substituted this four-part test for the alternative three-part test used by the district court in that case.  *Hatfield*, 2022 WL 2452379, at \*8, n. 5.  That three-part test is the same one suggested by Defendants.  *See* (Doc. 117 at 12.)  The court therefore takes the same approach as the Tenth Circuit and substitutes what the court of appeals has at least suggested is the correct standard.  *Id.*

[4] As noted above, Defendants analyze the retaliation claim under a different standard.  (Doc. 117 at 12.)  Additionally, some of their arguments are more appropriately resolved at the summary judgment stage as they call for the court to consider and weigh facts outside the complaint through the *McDonnell Douglas* analysis.  They argue that even if Plaintiffs can satisfy the prima facie test, the complaint's only evidence of intent is "temporal proximity" and that that is insufficient in the face of a "legitimate, non-retaliatory reason for lease termination."  (*Id.* at 12–13.)

them by serving a notice to quit within two days of the April 2, 2025, incident, by filing for eviction within 11 days after "Plaintiffs' protected May 1, 2025 rent action while this federal case was active; and coordinating with law enforcement to target Plaintiffs as documented in the Officer Safety Bulletin." (*Id.*) But on Plaintiffs' own pleaded facts, the court cannot characterize this as a "plausible" claim for retaliation under the FHA. *O'Connor*, 2026 WL 91584, at *3. As Defendants argue, Plaintiffs have not pled facts that show the actions taken against them were "on account of" their allegedly protected activity under the FHA. *Hatfield*, 2022 WL 2452379, at *8.

Plaintiffs plead that the notice to quit, served two days after the April 2 incident, cited "Crime Free Community Rules and Regulations Section E and Section F, alleging 'Threatening or intimidating, assault.'" (Doc. 111 at 14.) This undercuts their own allegations that the notice to quit and eviction proceedings were in retaliation for exercising their FHA rights. Moreover, the "Officer Safety Bulletin" invoked by Plaintiffs "confirms the April 2 arrest 'spurred evictions'". (*Id.* at 15.) This also undercuts Plaintiffs' retaliation allegations; the admitted fact that Plaintiff was arrested (as pled "on a single battery charge"), without more, renders conclusory Plaintiffs' allegation that their eviction was because of protected activity under the FHA. (*Id.* at 11.) Other actions allegedly prompting retaliation fare no better, as Plaintiffs fail to allege facts that support the claim that Defendants "coordinat[ed] with law enforcement to target" them "as documented in the Officer Safety Bulletin." (Doc. 111 at 22.) Without more, this is conclusory. The same goes for Plaintiff Rosalee Janette McClain's allegation that she was retaliated against because she "raise[d] concerns about the placement of a registered sex offender in violation of lease provisions . . . ." (*Id.*) Plaintiffs plead no facts that make it plausible to believe that the "retaliation" occurred because Plaintiffs raised concerns. To be sure, if Plaintiffs' allegations regarding the lease covenant and the placement of a registered sex offender in violation thereof are

12

true, they are understandably troubling; however, the allegations in the pleading suggest nothing more than a potential state law claim for breach of lease covenants, not a federal claim for FHA retaliation.  Accordingly, Plaintiffs' FHA retaliation claim must be dismissed.

### B.    Civil RICO

Plaintiffs invoke two different parts of the civil RICO statute: 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d).  Subsection (c) concerns participation in an enterprise's affairs through racketeering activity.  Subsection (d) concerns conspiracy to violate the RICO Act.  To properly plead a claim under § 1962(c) Plaintiffs must plausibly allege "(1) investment in, control of, or conduct of (2) an enterprise (3) through a pattern (4) of racketeering activity."  *Llacua v. Western Range Ass'n*, 930 F.3d 1161, 1176 (10th Cir. 2019) (*quoting Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006)).

The RICO Act contains several detailed definitions that must be satisfied for the act to apply.  18 U.S.C. § 1961 (1)–(10).  Additionally, courts have imposed pleading requirements specific to the RICO context.  Specific to Plaintiffs' claim, to "establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a person; and (2) an enterprise that is not simply the same person referred to by a different name."  *Llacua*, 930 F.3d at 1176 (citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001) (internal quotation marks omitted)).  Plaintiffs plead that their facts satisfy these definitions and requirements.  (Doc. 111 at 22–23.)

Defendants disagree and raise a host of arguments against application of the RICO Act.  First, they argue that Plaintiffs' allegations of "predicate acts" (used to establish a "pattern" of racketeering activity), are deficient for multiple reasons.  (Doc. 117 at 4–6.)  Next, they argue that Plaintiffs' allegations do not distinguish between the RICO "person" and the enterprise with which

13

they are involved. (*Id.* at 6.) Finally, Defendants argue that Plaintiffs have not adequately pled cognizable injuries under the statute. (*Id.* at 6–7.) Plaintiffs resist these arguments. (Doc. 118 at 2–9.) The court considers the arguments in turn.

     *1. Predicate Acts*

Courts have construed the statute's phrase "pattern of racketeering activity" to require the commission of at least two predicate criminal acts. *George v. Urban Settlement Serv.*, 833 F.3d 1242, 1254 (10th Cir. 2016) (citing 18 U.S.C. § 1961(5)). "But, 'while two acts are necessary, they may not be sufficient' to establish a pattern." *Id.* (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, n. 14 (1985)). "According to the Supreme Court, a RICO pattern requires that the racketeering predicates relate to each other and amount to a threat of continued racketing activity." *Johnson v. Heath*, 56 F.4th 851, 858–59 (10th Cir. 2022) (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

The Tenth Circuit has explained that the "relationship" standard is "not a cumbersome one" but nonetheless requires that the predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 859 (quoting *H.J. Inc.*, 492 U.S. at 240 and *Bixler v. Foster*, 596 F.3d 751, 761 (10th Cir. 2010)) (internal quotation marks omitted).

By contrast, the "continuity" standard is more "stringent." *Id.* The continuity inquiry is fact-specific. *Id.* There are two kinds of continuity: closed or open-ended. *Id.* "Closed-ended continuity is a closed period of repeated racketeering conduct, while open-ended continuity consists of racketeering conduct that threatens future repetition." *Id.* (citing *H.J. Inc.*, 492 U.S. at 241). Open-ended continuity is shown by "racketeering acts [that] involved implicit or explicit threats of repetition, that they formed the operations of an association that exists for criminal

14

purposes, or that they were the defendants' regular way of conducting a legitimate enterprise." *Id.* at 859–60 (citing *H.J. Inc.*, 492 U.S. at 241–42.)  Closed-ended continuity "consists of a closed period of repeated, related racketeering acts that do not necessarily threaten future repetition." *Id.* at 860.  The Tenth Circuit "consider[s] two factors when determining the existence of closed-ended continuity—the duration of the related predicate acts and the extensiveness of the racketeering scheme." *Id.* (citing *United States v. Smith*, 413 F.3d 1253, 1271–72 (10th Cir. 2005), *abrogated on other grounds by Boyle v. United States*, 556 U.S. 938 (2009)).  Extensiveness is informed by a range of considerations, including "the number of victims, the number of racketeering acts, the variety of racketeering acts, whether the injuries were distinct, the complexity and size of the scheme, and the nature or character of the enterprise." *Id.*  (internal quotation marks omitted).  This is a totality of the circumstances approach, and "no factor is required or dispositive." *Id.* at 861 (citing *Resol. Tr. Corp. v. Stone*, 998 F.2d 1534, 1543 n. 9, 1544 (10th Cir. 1993)).

Defendants here argue that Plaintiffs' predicate acts are deficient because the complaint (1) does not meet the pleading standard under Rule 9(b) and (2) does not identify two predicate acts attributable to SG Communities and Megan Baugh.  (Doc. 117 at 4–6.)  Plaintiffs fail to substantively respond to these arguments and instead insist that two predicate acts have been adequately pleaded.  (Doc. 118 at 4–6.)  The court agrees with Defendants.

Plaintiffs' complaint contains allegations of two predicate acts: wire fraud in violation of 18 U.S.C. § 1343 and obstruction of official proceedings in violation of 18 U.S.C. § 1512.  Defendants are correct that these predicates fail to satisfy the RICO Act's requirements.  The court will not address the Rule 9(b) pleading arguments raised by Defendants because the court holds that even assuming *arguendo* that the complaint satisfied Rule 9(b), the claim fails for other reasons.

15

First, Defendants are correct that Plaintiffs' burden is to identify two predicate acts attributed to *each* defendant.  As another court explained in *ZibalStar, L.C. v. Conte*, No. 17-CV-563, 2018 WL 1578019, at *4 (D. Utah Mar. 27, 2018):

> The Tenth Circuit's use of the word 'each' in *Hickenlooper* and *George* was not arbitrary. The language of § 1962(c) does not make it unlawful for an *enterprise* to conduct its own affairs through a pattern of racketeering activity. In fact, '§ 1962(c) requires that the "person" conducting the enterprise's affairs be distinct from the "enterprise."'  Rather, it is unlawful for a *person* to conduct the affairs of an enterprise *through* a pattern of racketeering activity. Consequently, it is not enough to allege that a RICO enterprise conducted its affairs through a pattern of unlawful activity and that the several defendants are part of the enterprise. Instead, to state a RICO claim against a person under § 1962(c), the plaintiffs must allege that each defendant conducted the affairs of an enterprise through the defendant's own pattern of racketeering activity.

(emphasis in original) (citations omitted); *see also In re HomeAdvisor, Inc. Litig.*, 491 F. Supp. 3d 879, 893 (D. Colo. 2020).  Given that Plaintiffs fail to so allege, and only attribute the wire fraud predicate to Amy Means (who is not a defendant but argued to be an agent of SG Communities), (*see* Doc. 118 at 5), this means there is only one predicate act alleged against SG Communities and none against Megan Baugh.  This is insufficient.

But even if the court construed Plaintiffs' second predicate act of obstruction of an official proceeding (which is alleged solely against Sheriff Easter) as applicable to Defendants SG Communities and Megan Baugh, it would still fail.  18 U.S.C. § 1512 is inapplicable to any of the allegations in this lawsuit because "official proceedings" is a term defined by statute and only applies to proceedings in federal courts, Congress, federal agencies, or certain insurance regulatory contexts.  *See* 18 U.S.C. § 1515(a)(1)(A)–(D); *see also Deck v. Engineered Laminates*, 349 F.3d 1253, 1257 (10th Cir. 2003) ("We must, however, disregard two of the alleged predicate acts. First, witness tampering is actionable under 18 U.S.C. § 1512 only if it takes place "in an official proceeding," which is defined in § 1515(a)(1) to include only federal proceedings.").  For these reasons, Plaintiffs' RICO claim against Defendants SG Communities and Megan Baugh must fail.

16

*2. Enterprise/Person Distinction*

Under § 1962(c) "the defendant person must be an entity distinct from the alleged enterprise." *Llacua*, 930 F.3d at 1182 (quoting *Brannon v. Boatmen's First Nat'l Bank of Okla.*, 153 F.3d 1144, 1146 (10th Cir. 1998)) (internal quotation marks omitted). The RICO "person" and "enterprise" may not be "simply the same person referred to by a different name. *Id.* (quoting *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 490 (6th Cir. 2013) (internal quotation marks omitted)). As the Tenth Circuit has explained, this is not an easy requirement to parse and is "heavily litigated." *Id.* at 1182–83. Defendants point to cases from this court that have apparently dismissed claims of a similar variety to Plaintiffs'. (Doc. 125 at 2–3.)

Plaintiffs posit that the "enterprise" in this case is a "seven-party association" made up of the Board of Commissioners of Sedgwick County, Defendant Easter, Defendants Humig and Nail, Defendant Langley, SG Communities, and Defendant Baugh. (Doc. 118 at 2.) SG Communities and Megan Baugh are alleged to be RICO "persons." (*Id.*) This is clearly distinct from the cases that Defendants cite, where the question was merely whether a corporation and its employees could be considered the "enterprise" and the corporation itself could be considered the "person." *See Tronsgard v. FBL Fin. Grp.*, 312 F. Supp. 3d 982, 995 (D. Kan. 2018) ("Defendants assert that plaintiffs' Complaint alleges that the RICO 'enterprise' consists of the defendant corporation, its subsidiaries, and agents who carry out the primary business of Farm Bureau by selling insurance products through the recruitment and use of insurance agents."); *Multi-Media Intern., L.L.C. v. Promag Retail Serv.*, 343 F. Supp. 2d 1024, 1035 (D. Kan. 2004) ("And as Defendant correctly points out, Defendant Promag cannot serve the dual role as a defendant and the enterprise in an action based on § 1962(c).").

Still though, Plaintiffs' claim does fail to plead an enterprise.  The Supreme Court has "explained [] that 'an enterprise includes any union or group of individuals associated in fact' . . . ."  *Boyle v. United States*, 556 U.S. 938, 944 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 580 (1981)).  "From the terms of RICO, it is apparent that an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Id.* at 946.  Plaintiffs have not pled these characteristics and therefore cannot plausibly allege that their "seven-party association" is an enterprise for the purposes of count V. This is an independent reason why Plaintiffs' count V claims must fail.

### 3.  Cognizable Injury

Defendants' last argument also succeeds.  Under the terms of the civil RICO statute, only those "injured in [their] business or property by reason of a violation of section 1962 may sue." 18 U.S.C. § 1964(c).  Courts have interpreted this to mean that certain injuries are not "recover[able.]"  *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 888–89 (10th Cir. 2017) ("But a plaintiff cannot recover for emotional, personal, or speculative future injuries under § 1964(c).").  Plaintiffs' complaint helpfully lists their injuries as: "loss of their home and personal property; emergency displacement housing costs documented in Airbnb receipts . . . ; exacerbation of service-connected PTSD, TBI, and stroke; disruption of VA-prescribed therapeutic housing stability; fear for personal safety; emotional distress; and all other damages to be proven at trial." (Doc. 111 at 16.)  The complaint also breaks out separate harms for Mrs. McClain who "suffered PTSD symptoms, anxiety, fear, loss of safety, and compounded distress arising from violations of her own rights and the violations of her husband's rights."  (*Id.*)

18

These alleged harms are not cognizable under 18 U.S.C. § 1964(c).  First, the claims of "exacerbation of PTSD, TBI, and stroke; disruption of VA-prescribed housing stability; fear for personal safety, [and] emotional distress" are all personal injuries and fall outside of the reach of § 1964(c).  *Amaya v. Bregman*, 149 F. Supp. 3d 1312, 1320 (D.N.M. 2015) ("In ordinary usage, injury to business or property does not denote physical or emotional harm to a *person.* Indeed the Supreme Court has declared that Congress' limitation of recovery to business or property injury retains restrictive significance. It would for example exclude personal injuries suffered. To establish standing under § 1964(c), a plaintiff must proffer proof of a concrete financial loss.") (cleaned up) (internal citations and quotation marks omitted) (emphasis in original).  The same is true of all of the individually listed harms pertinent to Mrs. McClain.

Plaintiffs' remaining harm of "loss of their home and personal property" to include "emergency displacement housing costs" is a closer call.  (Doc. 111 at 16.)  These are clearly harms to "property" which are covered by § 1964(c).  *See also Medical Marijuana, Inc. v. Horn*, 604 U.S. 593, 601 (2025) ("In short, a plaintiff can seek damages for business or property loss regardless of whether the loss resulted from a personal injury.").  But the statute has "other constraints on civil RICO claims." *Id.* at 612.  The Supreme Court has "reiterated that § 1964(c)'s 'by reason of' language demands 'some direct relationship between the injury asserted and the injurious conduct alleged.'" *Id.* (quoting *Holmes v. Sec. Inves. Prot. Corp.*, 503 U.S. 258, 268 (1992)).  "The key word is direct; foreseeability does not cut it." *Id.* (citation and internal quotation marks omitted).

Plaintiffs' claims are anything but direct.  Paragraphs 56 and 57 of Plaintiffs' complaint detail their view of causation.  (Doc. 111 at 23.)  Plaintiff claims that the enterprise began engaging in racketeering activity in June 2022 when an employee at Maple Village transmitted an offer to

19

Plaintiffs that they contend was fraudulent. (*Id.*) Plaintiffs argue that this pattern was "continuous" and commencing with the aforementioned email and "continuing through the concealment of the sex offender, the April 2, 2025 arrest, the retaliatory eviction, and the ongoing suppression of records through the date of this filing." (*Id.*) It should be clear that this is a very attenuated sequence of events, involving multiple parties that are not obviously connected, threaded together by only two events nearly three years apart. The Supreme Court and the Tenth Circuit have recognized that "RICO claims [fail] to meet the proximate cause element [when] '[t]he cause of [the] asserted harms' [is] 'a set of actions [] entirely distinct from the alleged RICO violation [].'" *Safe Streets Alliance*, 859 F.3d at 890 (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006)). Here, that is emphatically the case. The cause of the asserted harm (Plaintiffs loss of their home and property, and ensuing "displacement costs") is Plaintiffs' eviction, the cause of which is "entirely distinct" from the predicate acts (wire fraud and obstruction of official proceedings) that make up Plaintiffs' RICO claim. *Id.*; (Doc. 111 at 16, 23.) For this additional reason, Plaintiffs' RICO claim cannot proceed.[5]

## IV.    Conclusion

For the foregoing reasons, Defendants SG Communities' and Megan Baugh's motion to dismiss (Doc. 116) is GRANTED.

IT IS SO ORDERED. Dated this 10th day of June, 2026.

s/ John W. Broomes
JOHN W. BROOMES
CHIEF UNITED STATES DISTRICT JUDGE

---

[5] Because Plaintiffs' RICO claim under § 1962(c) fails, their conspiracy claim under § 1962(d) must fail as well. *See Tal v. Hogan*, 453 F.3d 1244, 1270 (10th Cir. 2006) (citing cases) ("If a plaintiff has no viable claim under § 1962(a), (b), or (c), then its subsection (d) conspiracy claim fails as a matter of law.").